UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

REGINA A. FRANK,

            Plaintiff,

       v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

            Defendant.

15-CV-3006-FVS

**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**

**THIS MATTER** comes before the Court based upon the parties' cross motions for summary judgment. Plaintiff Regina A. Frank is represented by D. James Tree. The Acting Commissioner is represented by Benjamin J. Groebner.

**BACKGROUND**

Regina Frank was born on October 15, 1970. Assuming her account of her life is reasonably accurate, she has suffered grievously. Her mother was an alcoholic (TR 777), who was both emotionally and physically abusive. She consistently demeaned Ms. Frank and repeatedly beat her, frequently using a belt buckle. (TR 63.) Nor was her mother the only who abused her. One of her brother's friends raped her when she was seven years old. (TR 777.)

Order ~ 1

Even without the abuse, school would have been a severe challenge. As it was, Ms. Frank dropped out after the seventh grade. (TR 48.) She tried to pass the General Educational Development tests; but even with help, she was unable to do so. (TR 48.) She can read simple words, and she can perform basic addition and subtraction. However, that's about it. *Id.*

Ms. Frank married at age 17 so as to escape her mother's abuse. Unsurprisingly, the man she married also was abusive, the first of several such husbands. She says, rather matter-of-factly, "He used to sit on top of me and punch me in the face until I passed out." (TR 59.) There is some indication she suffered organic brain damage as a result of the repeated beatings. (TR 61.) Her fourth husband was a decent man. However, she candidly admits that, by then, she was incapable of responding appropriately. She regretfully confesses, "I became the abuser." (TR 59.)

Early on, she turned to alcohol for relief. She regularly drank to excess, accumulating six DUIs over the years. (TR 53.) Bad as her rap sheet is, it tells only part of the story. Due, in part, to her abuse of alcohol (and perhaps other drugs), she has limited contact with her seven children. (TR 62.) It is true that men have drifted in and out of her life, but, for the most part, she is alone in the world. (TR 60, 68-69.) Coping is difficult. She says she has become anxious, fearful and forgetful. (TR 54, 56, 58-59, 64.)

Order ~ 2

Ms. Frank has worked sporadically as a cook and housekeeper.  (TR 106.)
Although she is unemployed at this time (TR 54), she has contributed enough to
the Social Security Disability Insurance Program to qualify as an "insured" for
purposes of Title II (TR 19).  See 20 C.F.R. § 404.101 (explaining what the SSA
means by "insured status").  Ms. Frank has no income.  She receives $197.00
each month from the State of Washington.  (TR 54-55.)  Given her poverty, she
has no home.  She sleeps wherever she can.  (TR 56.)

On December 7, 2010, Ms. Frank applied for Title II disability insurance
benefits ("DIB") and Title XVI supplemental security income ("SSI").  42 U.S.C. §§
401-434, 1381-1383f.  She alleges she had become disabled by October 1, 2006.
In response to Ms. Frank's application, the Social Security Administration asked
Jesse McClelland, M.D., a psychiatrist, to evaluate her.  Dr. McClelland examined
Ms. Frank on May 21, 2011.  He diagnosed multiple psychological problems.  (TR
781.)  Based upon a finding of "severe impairment in multiple areas of
functioning," he assigned a GAF score of 25.  *Id.*  The acronym "GAF" stands for
Global Assessment of Functioning.  A GAF score is a rough estimate of an
individual's psychological, social, and occupational functioning that is used to
reflect the individual's need for treatment.  *Brewes v. Comm'r of Soc. Sec. Admin.*,
682 F.3d 1157, 1160 n.2 (9th Cir.2012) (quoting *Vargas v. Lambert*, 159 F.3d
1161, 1164 n.2 (9th Cir.1998)).   A GAF score of 25 indicates behavior that "is

Order ~ 3

considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 34 (4th ed., text revision, 2000) (emphasis in original).  Although Dr. McClelland determined Ms. Frank's psychological problems "are treatable," *id.*, he also thinks treatment would be "very complicated," id., and her overall prognosis must be considered "poor."  *Id.*  His assessment of her ability to work was bleak, to say the least.  In his opinion, she would be unable to perform detailed or complicated tasks.  (TR 782.)  Not only that, but also she would have trouble interacting with supervisors, coworkers or the public.  *Id.*  She would need extra instruction.  *Id.*  She would struggle to maintain regular attendance, id., and, when working, she likely would suffer panic attacks.  *Id.*

The Social Security Administration ("SSA") was not persuaded by Dr. McClelland's assessment.  Credibility was an issue.  The SSA staff members who worked with Ms. Frank suspected she was overstating the severity of her symptoms.  (TR 105.)  Since Dr. McClelland relied heavily upon her statements, they questioned his conclusions.  (TR 106.)  In the end, the SSA decided Ms.

Frank is capable of performing jobs that exist in the national economy and, thus, she is not disabled. (TR 107.)

Ms. Frank requested reconsideration. The SSA submitted her medical records to a physician (Howard Platter, M.D.) and a psychologist (Sharon Underwood, Ph.D.). Dr. Underwood agreed Ms. Frank is not credible. (TR 140.) She also agreed Dr. McClelland overstated the severity of Ms. Frank's mental impairments. (TR 141.) Among other things, she took issue with the GAF score Dr. McClelland assigned. She wrote, "A GAF of 25 . . . would be more suitable for a person who was so severe as to be hospitalized." (TR 145.) Dr. Underwood's assessment carried the day. The SSA denied reconsideration. (TR 147.)

Ms. Frank next requested a hearing before an Administrative Law Judge ("ALJ"). Prior to the hearing, she was evaluated by Aaron Burdge, Ph.D., a psychologist. Dr. Burdge administered psychological tests and interviewed Ms. Frank. His assessment was consistent with Dr. McClelland's. He diagnosed "Major Depressive Disorder," "Posttraumatic Stress Disorder," and "Borderline Personality Disorder." (TR 835.) As for GAF, he assigned a score of 28. *Id.*

On February 7, 2013, an Administrative Law Judge ("ALJ") conducted a hearing by videoconference. (TR 19.) Ms. Frank was present with her attorney. She testified, as did a vocational expert. The ALJ issued an unfavorable ruling on May 30, 2013. As part of the process, the ALJ formulated Ms. Frank's Residual

Order ~ 5

Functional Capacity ("RFC").  A claimant's RFC is the SSA's assessment of the most she can do in a work setting despite her physical limitations.  20 C.F.R. §§ 404.1545, 416.945.  In doing so, the ALJ had to weigh the evidence.  Not only did the ALJ discount Ms. Frank's testimony, but also the ALJ discounted the opinions of Dr. McClelland and Dr. Burdge.  Ultimately, the ALJ decided jobs exist in the national economy that Ms. Frank is capable of performing.  That being the case, the ALJ ruled she is not disabled.  (TR 33-34.)

Ms. Frank asked the Appeals Council to review the ALJ's unfavorable ruling.  However, on November 4, 2014, the Appeals Council decided not to do so.  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.984(d), 416.1484(d).  Ms. Frank commenced this action on January 8, 2015.  42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

A district court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*  As a result, the Commissioner's decision "will be disturbed only if it is not supported by substantial evidence or it is based

Order ~ 6

on legal error." *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986). "Substantial evidence" means more than a mere scintilla, . . . but less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988) (internal punctuation and citations omitted).

### MS. FRANK'S CREDIBILITY

At the administrative hearing, Ms. Frank described her impairments and the symptoms they allegedly produce. The ALJ found Ms. Frank suffers from severe impairments, and she further found Ms. Frank's impairments are capable of causing the symptoms Ms. Frank described. (TR 30.) Given those findings, the ALJ was required to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms" in order to determine "the extent to which the symptoms affect [Ms. Frank's] ability to do basic work activities." SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996). "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." Id. In order to assess a claimant's credibility, the ALJ must carefully examine the record as a whole. The ALJ must decide whether the claimant's "statements can be believed and accepted as true." SSR 96-7p, 1996 WL 374186, at *4. If there is no evidence of malingering on the claimant's part, "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons

Order ~ 7

for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir.1996).  In this instance, the ALJ decided Ms. Frank's description of her symptoms was not entirely credible.  (TR 30.)

The ALJ provided a number of reasons for discounting Ms. Frank's credibility.  The first reason involves an inaccurate statement Ms. Frank made while testifying.  The ALJ was questioning her about alcohol use.  The ALJ asked, "Do you attend any AA or NA meetings?"  (TR 51.)  Ms. Frank answered, "No, I don't. . . . [W]hen I have a place to live, I don't go nowhere.  It's too hard to get out.  I can't be around people.  I get real sick to my stomach." *Id.* at 51-52.  The ALJ seized upon the statement, "I don't go nowhere."  The ALJ treated it as an assertion on the part of Ms. Frank that "she does not leave her home" except in the case of emergencies.  (TR 30.)  Since Ms. Frank does leave home from time to time (when she as a place to call home), the statement in question is literally false.  The ALJ treated the statement as a false statement and cited it as a reason to question Ms. Frank's credibility.

The ALJ's construction of the statement in question is wide of the mark. Considering everything Ms. Frank said, it is unreasonable to construe the statement "I don't go nowhere" as an assertion of fact.  Rather, it appears Ms. Frank was using exaggeration to make a point, *viz.*, that interacting with people

Order ~ 8

is difficult for her.  Using exaggeration to make a point is an accepted rhetorical device.  Typically, it is called hyperbole.

The ALJ's second reason for discounting Ms. Frank's testimony involves alleged inconsistencies in her statements concerning drinking.  There are multiple references to alcohol consumption in the record.  For example, both Dr. McClelland and Dr. Burdge asked Ms. Frank about alcohol and drugs.  Dr. Mclelland's report states, "She says that she used to drink alcohol but no longer does.  She has never used drugs.  She has never had a problem with alcohol; she has always liked to be in control."  (TR 779.)  Dr. Burdge says Ms. Frank made similar statements to him.  "Regina reports she used to drink but no longer does.  She has never used drugs.  She has never had a problem with alcohol, she has always liked to be in control."  (TR 834.)

The ALJ raised the issue of alcohol consumption during the administrative hearing.  Ms. Franks initially testified she does not "currently drink alcohol."  (TR 49.)  She admitted she once drank large quantities of alcohol ("30-pack a day plus"), but she insisted she quit drinking three years before the hearing, although she acknowledged "[e]very once in a while I'll pick up a drink . . . ."  *Id.*  The ALJ was not entirely satisfied with Ms. Frank's answers, returning to the issue of alcohol consumption later in the hearing.  In response to the ALJ's follow-up questions, Ms. Franks testified, "I drink.  On occasion I'll have a beer or

Order ~ 9

two, but . . . I don't get drunk.  I don't drink heavily.  The last time I drank heavily was a long time ago." (TR 65.)  As the ALJ noted, Ms. Frank's statements to Dr. McClelland and Dr. Burdge are not entirely consistent with her testimony during the administrative hearing.  Assuming Ms. Frank's testimony about alcohol consumption is reasonably accurate, her comments to Dr. McClelland or Dr. Burdge significantly understate the extent of her drinking.  The ALJ properly noted her lack of candor.

Closely associated with alcohol consumption is drug use.  Ms. Frank has steadfastly denied using illicit drugs; but, as the ALJ noted, there is evidence in the record to the contrary.  Ms. Frank went to emergency room at the Yakima Regional Medical Center on January 2, 2011, complaining of a migraine headache.  (TR 732.)  The examining physician ordered a urine drug screen. *Id.* at 734.  The test must have indicated methamphetamine consumption because the "Discharge Diagnosis" was "Acute Non-Specific Headache, Methamphetamine use." (TR 739.)  Ms. Frank acknowledges the results of the urine screen.  However, she notes she was taking an antidepressant at the time and the antidepressant she was taking can produce a false positive for methamphetamine.  (Plaintiff's Motion at 25.)  Ms. Frank has a point.  Tests sometimes produce false positives.  However, Ms. Frank's treating physician accepted the results of the test that is at issue here.  She utilized the test results

Order ~ 10

in arriving at her diagnosis.  That being the case, it was not unreasonable for the ALJ to consider the results of the test.  In view of the test results indicating the consumption of methamphetamine, the ALJ properly was skeptical of Ms. Frank's assertion she "has never used drugs."

The ALJ's third reason for discounting Ms. Frank's testimony involves statements she made about showering.  On at least two occasions during the disability evaluation process, the SSA asked Ms. Frank to complete a questionnaire that is entitled "Function Report."  One section of a Function Report asks the respondent to describe her personal hygiene.  In a report that is dated April 22, 2011, Ms. Frank wrote, "[C]an't take showers[,] can't stand that long."  (TR 298.)  As the ALJ recognized, she appears to have been alluding to some physical problem.  (TR 30.)  By contrast, in a report that is dated August 6, 2011, she wrote she was showering compulsively, i.e., "4/5 showers a day."  (TR 324.)  As the ALJ recognized, she appears to have been alluding to some psychological problem.  (TR 30.)  In the ALJ's opinion, the two reports are inconsistent and the inconsistency tends to undermine Ms. Frank's credibility. (TR 30.)

The ALJ would have a stronger argument if the record contained evidence indicating Ms. Frank's showering practices did not change between April and August of 2011.  Were that the case, the August report would be inaccurate and

Order ~ 11

the inaccuracy would reflect adversely upon Ms. Frank's credibility.  However, there is no reason to doubt the accuracy of either report.  In other words, it appears Ms. Frank's showering practices actually changed between April and August.  Furthermore, the two Function Reports she completed hint at why the change occurred.  During April, she was suffering from a physical problem that limited her ability to shower.  During August, she was suffering from a psychological problem that prompted her to shower compulsively.  Ms. Frank's change in circumstances explains the change in her behavior.  There is no inconsistency between the statements she made in the two Function Reports.  In fairness, all one can say is that Ms. Frank showered more during August of 2011 than she did during April.  The ALJ read too much into two cryptic statements.

The ALJ's fourth reason for discounting Ms. Frank's credibility involves observations that health care providers made while treating her.  On a number of occasions, wrote the ALJ, health care providers "note[d] no psychological problems."  (TR 30.)  One of the occasions cited by the ALJ occurred on September 21, 2010.  Ms. Frank went to Yakima Neighborhood Health Services complaining of back pain and asthma.  (TR 762.)  During the course of the visit, she asked a nurse practitioner to refill her prescription for "bipolar disorders." (TR 763.)  The nurse practitioner questioned her about her mental health problems.  The nurse practitioner summarized Ms. Frank's answers in a section

Order ~ 12

of her report that is entitled "Neuro/Psychiatric." (TR 763.) Ms. Frank said she was taking the prescribed medication each day. She said her symptoms were stable. Interestingly, in the same section, the nurse practitioner indicated Ms. Frank was "Positive for . . . Psychiatric symptoms." It's unclear what the nurse practitioner meant by the term "Psychiatric symptoms."

Another example cited by the ALJ provides stronger support for her assertion there were multiple instances when health care providers who examined Ms. Frank "note[d] no psychological problems." This is Ms. Frank's trip to the emergency room at the Yakima Valley Medical Center on January 2, 2011. As will be recalled, on that occasion, Ms. Frank complained of a migraine headache. The doctor who treated Ms. Frank noted, "Alert and oriented to person, place, and time with normal affect." (TR 733.)

Without question, the observations of health care providers are important. Ms. Frank has been treated at hospitals on a number of occasions. The persons who treated her looked for symptoms of psychiatric problems. By and large, they did not observe such symptoms. In the ALJ's opinion, if Ms. Frank is as impaired as she claims, she should have exhibited symptoms of impairment when interacting with health care providers.

The ALJ's fifth and final reason for discounting Ms. Frank's testimony involves her failure to obtain professional assistance in managing her mental

Order ~ 13

impairments.  This circumstance is potentially relevant because a claimant's failure to seek or participate in treatment can undermine her credibility.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir.2012).  However, in the case of a claimant who is alleging severe mental impairments, her failure to seek treatment must be analyzed with great care.  Mental illness can have a paralyzing effect.  This is a phenomenon the Ninth Circuit also has recognized.  *Cf. Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir.1996) (an ALJ should be slow to "'to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation'" (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989))).

The ALJ questioned Ms. Frank about treatment at the administrative hearing.  (TR 55.)  Ms. Frank denied she missed counseling appointments.  The problem, she said, was she had gone to appointments when she was sick.  When that happened, her counselor cancelled the appointment and told her the appointment would be rescheduled.  According to Ms. Frank, she repeatedly had "to start all over again . . . with . . . counseling[.]"  (TR 55.)

Ms. Frank's explanation of her failure to obtain counseling generates as many questions as it answers.  Nevertheless, it is unrebutted.  That being the case, one must assume her explanation is reasonably accurate as far as it goes, even while recognizing her explanation likely is incomplete.  Given the ambiguity, ALJ should not have blamed Ms. Frank for failing to seek assistance.

Order ~ 14

The ALJ erred by relying upon the absence of treatment as a reason for questioning Ms. Frank's credibility.

These, then, are the five reasons the ALJ gave for discounting Ms. Frank's credibility. Of the five, only two actually support her decision. The ALJ properly questioned whether Ms. Frank fully disclosed to Dr. McClelland and Dr. Burdge the extent of her alcohol and drug use; and the ALJ properly noted that some of Ms. Frank's health care providers did not observe symptoms of mental impairment when treating her. These are important considerations. One would expect a person who is suffering from severe mental impairments to exhibit symptoms of her impairments when interacting with health care providers. Even more damaging is Ms. Frank's lack of candor when responding to Dr. McClelland's and Dr. Burdge's questions about drinking. A psychological assessment is only as valid as the data upon which it is based. The fact Ms. Frank seriously understated the extent of her drinking, and probably lied about drug abuse, tends to undermine her credibility. However, the Court cannot be sure the ALJ would have discounted Ms. Frank's testimony, or discounted it as much, had the ALJ not relied upon the three invalid considerations discussed above.

**JESSE McCLELLAND**

Dr. McClelland is a psychiatrist who examined Ms. Frank at the request of the SSA. His assessment of Ms. Frank was bleak. Among other things, he

Order ~ 15

concluded she would have trouble performing complicated tasks, interacting with other people, or reporting for work each day.  The ALJ discounted his opinions.  Broadly speaking, the ALJ's criticisms of Dr. McClelland's assessment may be grouped into three categories.  She thinks some of Ms. Frank's statements to Dr. McClelland were untruthful.  She thinks his diagnosis is undermined by some of the observations he made during the course of the examination.  Finally, she thinks his diagnosis significantly overstates the extent of Ms. Frank's impairments.

The ALJ's first criticism is supported by substantial evidence.  The ALJ reasonably found Ms. Frank was less than candid when discussing alcohol and drugs with Dr. McClelland.  Ms. Frank's lack of candor is a serious matter.  Dr. McClelland needed accurate information about her consumption of alcohol and illicit drugs in order to properly evaluate her.  Some of the information Ms. Frank provided to him was inaccurate.

The ALJ's remaining criticisms are more problematic.  As part of his "Mental Status Examination," Dr. McClelland noted Ms. Frank was "[p]olite and cooperative with good eye contact."  He went on to note that her "[t]hought process is linear," that she was "alert and oriented," and that her "[r]emote memory seems to be intact[.]"  (TR 780.)  Given the preceding observations, the ALJ questioned the bleakness of Dr. McClelland's assessment.  However, in doing

Order ~ 16

so, the ALJ erred.  The problem with her approach to Dr. McClelland's report is this:  Each observation he made during the examination must be interpreted in the context of the examination as a whole.  Dr. McClelland is trained to interpret the data he collected; the ALJ is not.  Dr. McClelland was well aware of the circumstances cited by the ALJ and yet he rendered the diagnosis he did.  Cherry-picking a few of his observations in order to impeach his ultimate conclusions is methodologically unsound.

The ALJ's third criticism of Dr. McClelland involves the GAF score he assigned.  As will be recalled, the acronym "GAF" stands for Global Assessment of Functioning.  Dr. McClelland assigned a score of 25, which is very low.  Dr. McClelland's assessment was reviewed by Dr. Underwood, a psychologist.  She took exception to the score Dr. McClelland assigned.  Her rationale may summarized thus:  A person with a GAF score of 25 would require hospitalization.  It is not the case Ms. Frank requires hospitalization.  Therefore, Ms. Frank's GAF score must be higher than 25.  (TR 145.)

It is useful to begin with Dr. Underwood's assertion that a person with a GAF score of 25 would require hospitalization.  In many cases, a GAF of 25 would indicate a need for hospitalization.  However, that is not always the case.  A score of 25 places a patient in the range 21 to 30.  The DSM-IV describes the attributes of a person who falls within that range, and some of them are dire indeed.  For

Order ~ 17

example, a person falling in the 21 to 30 range may suffer from delusions, hallucinations, or serious impairment in communication. *Supra* at 4. Obviously, a person who is experiencing one of those conditions needs intense psychiatric care. That said, one need not be experiencing hallucinations in order to fall in the 21 to 30 range. The range also includes the person who stays in bed all day, has no job, has no home, and has no friends. *Supra* at 4. Those attributes tend to describe Ms. Frank. Consequently, she could have a GAF score of 25 even though she does not require hospitalization.

Dr. Burdge agreed with Dr. McClelland's assessment. The latter performed his examination after Dr. Underwood reviewed Ms. Frank's records. Perhaps Dr. Underwood would have reacted differently to Dr. McClelland's assessment had she known Dr. Burdge agreed; perhaps not. But that is beside the point. The point is that the two examining mental health professionals are in agreement Ms. Frank falls within the range 21 to 30. With all due respect to Dr. Underwood, her review of the records does not provide the ALJ with a sound basis for discounting the opinions of the two examining mental health professionals.

To summarize, the ALJ reasonably determined Ms. Frank did not truthfully answer all of Dr. McClelland's questions about alcohol and drugs. Consequently, the ALJ was legitimately concerned he had relied upon inaccurate information in reaching his diagnosis. One cannot say the same about the ALJ's remaining

Order ~ 18

concerns.  Dr. McClelland considered the fact that Ms. Frank's thought process was linear, that she was alert and oriented, and that her remote memory seemed to be intact.  It was up to Dr. McClelland, not the ALJ, to assess the significance of those circumstances.  Similarly, the ALJ erred by dismissing the GAF score Dr. McClelland assigned.  Dr. McClelland's assessment was consistent with that of Dr. Burdge, and it was they, not Dr. Underwood, who examined Ms. Frank.

**AARON BURDGE**

Dr. Burdge is a psychologist who examined Ms. Frank at the request of the SSA.  His assessment of Ms. Frank is consistent with that of Dr. McClelland.  The ALJ discounted both assessments.  Some of her criticisms applied to both.  For one thing, she thought both assessments had been compromised to some extent by Ms. Frank's lack of candor.  For another thing, she thought the GAF scores assigned by both Dr. McClelland and Dr. Burdge (25 and 28, respectively) were unduly pessimistic.  These criticisms have already been discussed.  Consequently, it is appropriate to turn to the criticisms that are specific to Dr. Burdge's assessment.  The ALJ identified two additional circumstances that undermined her confidence in his conclusions.  One was Ms. Frank's performance on certain psychological tests.  On the two tests in question, her performance was in the normal range.  In the ALJ's opinion, the test results demonstrate "some ability to focus and sustain attention and concentration."

Order ~ 19

(TR 32.)  The ALJ thought this observation was reinforced by Dr. Burdge's

conclusion that Ms. Frank's concentration is "within normal limits."  *Id.*  Another

circumstance that concerned the ALJ was Dr. Burdge's failure to explain why he

thinks her short- and long-term memory is impaired.  *Id.*

The ALJ's criticisms of Dr. Burdge's opinions are clear enough, but they do

not provide a convincing basis for the ALJ's decision to discount his opinions.

Essentially the ALJ cherry-picked Dr. Burdge's report, emphasizing those parts

that suggest Ms. Frank can work and depreciating those parts that suggest she

cannot.  Approaching a psychological report in this manner is methodologically

unsound.  Each piece of data must be considered in relation to every other piece.

Dr. Burdge did that when he prepared his report.  It was inappropriate for the

ALJ to reweigh the data.

**CONCLUSION**

The ALJ improperly discounted the testimony of Ms. Frank and the

opinions of Dr. McClelland and Dr. Burdge.  The ALJ's errors in that regard were

not harmless.  Thus, the Court must craft an appropriate remedy.  Where, as

here, an ALJ has committed a prejudicial error, "the proper course, except in rare

circumstances, is to remand to the agency for additional investigation or

explanation."  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th

Cir. 2014) (internal punctuation and citation omitted).  This is such a case.  The

Order ~ 20

ALJ must reassess the weight to be given to the testimony of Ms. Frank and to the opinions of Dr. McClelland and Dr. Burdge.  The ALJ is not precluded from reopening the hearing to receive additional evidence should she decide that course of action is appropriate.  *See id.* at 1105.

**IT IS HEREBY ORDERED**:

1.  The defendant's motion for summary judgment (**ECF No. 18**) is **denied** and the plaintiff's (**ECF No. 14**) is **granted**.

2. The ALJ's decision of May 30, 2013 (TR 34) is reversed and the case is remanded to the ALJ for further proceedings.

3. The ALJ shall reassess the weight to be given to the testimony of Ms. Frank and to the opinions of Dr. McClelland and Dr. Burdge.  If necessary, the ALJ may reopen the hearing and receive additional evidence.

**IT IS SO ORDERED**.  The District Court Executive is hereby directed to file this Order and furnish copies to counsel.

**DATED** this 30th day of June, 2016.


s/Fred Van Sickle
FRED VAN SICKLE
Senior United States District Judge